UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────────

RON BENVENISTI,

                    Plaintiff,                     **04 Civ. 3166 (JGK)**

          - against –                              OPINION AND ORDER

THE CITY OF NEW YORK and ELIZABETH
GLAZER, individually and in her
Official capacity,
                    Defendants.
─────────────────────────────────────

**JOHN G. KOELTL, District Judge:**

     This dispute arises from a public employee's claim that his
employer terminated him in retaliation for his protected speech.
The plaintiff, Ron Benvenisti, was employed as a computer
operations manager by the City of New York (the "City") in its
Department of Investigations ("DOI") from July 2001 until
December 18, 2002, when he was terminated.  Benvenisti commenced
this action in March 2004 against the City and Elizabeth Glazer,
the DOI Chief of Staff, contending that his alleged retaliatory
discharge violated the First and Fourteenth Amendments to the
United States Constitution, 42 U.S.C. § 1983, and the New York
City Whistleblower Law, Administrative Code of the City of New
York § 12-113 ("Whistleblower Law").[1]

───────────────────

[1] The plaintiff originally brought these claims against DOI also.  However,
the plaintiff orally withdrew his claims against DOI at a pre-motion
conference held on September 15, 2005.  (See Defendants' Letter, dated Sept.
14, 2006.)

The defendants move for summary judgment, arguing that the plaintiff cannot satisfy the requisite elements of a First Amendment retaliation claim under Section 1983, cannot establish liability for the City and Glazer in her official capacity, and has no claim under the New York City Whistleblower Law because there is no private right of action under that statute. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

For the reasons set forth below, the defendants' motion for summary judgment is **granted.**

**I.**

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding

them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.  The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Gallo, 22 F.3d at 1223.  Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party.  See Chambers v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for

trial." Fed. R. Civ. P. 56(e). The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998).

## II.

The following facts are undisputed unless otherwise noted. The plaintiff, Ron Benvenisti, was employed as a computer operations manager in the Citywide Informational Security Architecture Formulation Enforcement ("CISAFE") unit of DOI from July 2001 until December 18, 2002, when he was discharged. (Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts ("Defs.' Stmt.") ¶¶ 1-2; Plaintiff's Counter-Statement Pursuant to Local Rule 56.1 ("Pl.'s Stmt.") ¶¶ 1-2; Compl. ¶ 9.) Although many of the facts preceding the plaintiff's discharge are undisputed, the parties fundamentally disagree about the ultimate reason for the plaintiff's discharge.

### A.

The plaintiff alleges that he was discharged because he complained about and eventually threatened to report formally a conflict of interest involving DOI's employment of Eli Khedouri,

a nephew of DOI Chief of Staff Elizabeth Glazer.  (See Compl. ¶ 26; Pl.'s Stmt. ¶¶ 4, 14, 26, 37, 38-39, 41-42, 45.)

As a computer operations manager, the plaintiff was responsible for managing the City's information security.  (See Defs.' Stmt. ¶ 3; Pl.'s Stmt. ¶ 3; Ex. D to Aff. of Ron Benvenisti, May 5, 2006 ("Ben. Aff.").)  His duties included managing engineers, analysts, consultants, and technical staff. (Id.)  The plaintiff's performance evaluation, which the plaintiff signed on November 18, 2002, also evaluated the plaintiff on his "[p]resenting, explaining, and marketing the work unit's activities to higher level supervisors in the agency and/or persons and groups outside the agency."  (Ex. D to Ben. Aff.)

One of the individuals that the plaintiff was responsible for supervising was Khedouri.  (Defs.' Stmt. ¶ 4; Pl.'s Stmt. ¶ 4.)  Khedouri was the nephew of the defendant Elizabeth Glazer. (Defs.' Stmt. ¶ 4; Pl.'s Stmt. ¶ 4; Decl. of Elizabeth Glazer, Oct. 28, 2005 ("Glazer Decl."), at 14.)

DOI first offered Khedouri a position as a volunteer intern in the CISAFE unit during the summer of 2002.  (See Defs.' Stmt. ¶ 5; Pl.'s Stmt. ¶ 5.)  Several weeks into the internship, DOI began considering Khedouri for a paid, full-time position.  At the time, Benvenisti supported Khedouri for the position.[2]  (See

---

[2] For example, in an email regarding Khedouri's possible employment, the

Defs.' Stmt. ¶ 5; Pl.'s Stmt. ¶ 5; Ex. C to Depo. of Ron
Benvenisti, May 25, 2005 ("Ben. Depo. I"), attached as Ex. C to
Decl. of Terri Feinstein Sasanow, Oct. 28, 2005 ("Sasanow
Decl.").)

Before hiring Khedouri as a paid employee, DOI sought and
received an official opinion from the City's Conflict of
Interest Board ("COIB") to determine whether hiring Khedouri
would violate any of the City's conflict rules because Khedouri
was Glazer's nephew.  (Defs.' Stmt. ¶ 6; Pl.'s Stmt. ¶ 6.)
Based in part on the representation that Glazer would recuse
herself from the day-to-day operations of CISAFE, the COIB
advised DOI that hiring Khedouri would not violate any of the
City's conflict rules.  (Ex. T to Glazer Decl. at 2.)  DOI then
hired Khedouri as a paid, full-time employee in the CISAFE unit
in August 2002.[3]  (See Glazer Decl. at 14; Ex. C to Ben. Aff.)

According to the plaintiff, Khedouri's employment created a
number of problems within CISAFE.  (See Pl.'s Stmt. ¶ 4.)
Khedouri worked less than other employees. (Ben. Depo. I at 15–
16.)  He often did not have his identification or his DOI-issued
cell phone.  (Id. at 16; Pl.'s Stmt. ¶ 4.)  The plaintiff

---

plaintiff stated that as an intern Khedouri had "demonstrated a level of
knowledge, skill and hands on expertise that is industry top-tier excellent."
(Ex. C. to Ben. Depo. I.)  In responding to the current motion, the plaintiff
qualified this recommendation by stating that it was made in part because he
was desperate for additional personnel.  (Pl.'s Stmt. ¶ 5.)

[3] The plaintiff did not learn of Khedouri's relationship with Glazer until
right around the time he was hired.  (Ben. Depo. I at 64.)

regularly could not locate Khedouri or determine the work he was doing.  (Id.)  When the plaintiff inquired about Khedouri's whereabouts, his staff would tell him that Khedouri was dining with Glazer or DOI Commissioner Rose Gill Hearn or working on special assignments for Glazer.  (Ben. Depo. I at 16.)

In addition, the plaintiff alleges that the appearance that Khedouri received specialized treatement lowered office morale. (Id. at 17; Pl.'s Stmt. ¶ 26.)  Khedouri received a larger salary than more senior employees.[4]  (See Ben. Depo. I at 16, 35; Depo. of David VanderNaalt, June 28, 2005 ("Vander. Depo."), at 80-81, attached as Ex. G to Sasanow Decl.)  DOI allegedly hired Khedouri quickly despite the lack of documentation that had delayed past applications.  (Ben. Depo. I at 20-21.)  The plaintiff also testified that the Commissioner once personally inspected Khedouri's office to ensure that he was comfortable. (Id. at 79.)

In October 2002, the plaintiff began complaining (and referring his staff's complaints) about Khedouri to his supervisor, David VanderNaalt.  (See id. at 7-8, 11; Pl.'s Stmt. ¶ 17.)  These complaints concerned the alleged negative impact of Khedouri's performance on CISAFE's productivity, efficiency,

---

[4] Khedouri received an annual salary of $105,000 with benefits.  (Vander. Depo. at 82.)  However, prior to hiring Khedouri, the plaintiff himself had recommended that Khedouri receive a total salary package worth around $125,000 (with the benefits included in that value).  (Ex. C. to Ben. Depo. I.)

and functionality.  (See Ben. Depo. I at 18, 34-35; Pl.'s Stmt. ¶ 26.)  The plaintiff complained that Khedouri's salary and actions lowered office morale.  (See Ben. Depo. I at 17-18; Pl.'s Stmt. ¶ 26.)  The plainfiff also alleges that he complained that Khedouri's salary was exorbitant and prevented DOI from hiring additional employees.  (See Pl.'s Stmt. ¶ 26.)

The plaintiff claims that he lodged these complaints on at least a weekly basis in formal status meetings with his supervisor, David VanderNaalt and on an ad hoc basis at other times.  (Ben. Depo. I at 21; see also Pl.'s Stmt. ¶ 17.)  The plaintiff alleges that he voiced similar complaints to other supervisors, Vincent Green and Robert Joyce.[5]  (Id. at 28-30.)

On the afternoon of December 17, 2002, after several months of inaction, the plaintiff told VanderNaalt that he planned to take his complaints to the New York City Council, the Conflict of Interest Board, or the Public Advocates Office.  (Ben. Depo. I at 25-26; Pl.'s Stmt. ¶ 42.)  This was the first time that the plaintiff told VanderNaalt that he was intent on making a formal written complaint about Khedouri.  (Ben. Depo. I at 37; Pl.'s

---

[5] According to the defendants, the precise organizational chart was as follows:  the plaintiff was a CISAFE Manager.  Above him was David VanderNaalt, the Deputy Director of CISAFE.  Above VanderNaalt was Robert Joyce, DOI Inspector General and Assistant Commissioner.  Above Joyce was Vincent Green, DOI Assistant Commissioner.  Above Green was Dan Brownell, DOI Deputy Commissioner.  Above Brownell was Elizabeth Glazer, DOI Chief of Staff.  Brownell reported to Glazer on all issues other than those involving CISAFE.  Finally, above Glazer was Rose Gill Hearn, DOI Commissioner.  The defendants explained this organizational chart at oral argument on September 12, 2006.  The plaintiff did not disagree except to note that the plaintiff disputes that Glazer removed herself from all issues involving CISAFE.

Stmt. ¶ 42.)[6]  According to the plaintiff, VanderNaalt advised him to wait until the following day.  (Ben. Depo. I at 26; Pl.'s Stmt. ¶ 42.)  The following morning, the plaintiff was discharged.  (Id.)

### B.

The defendants dispute the plaintiff's claim that he was terminated because of his alleged complaints.  The defendants first present a different set of events, which they allege actually led to the plaintiff's discharge.  Second, the defendants allege that the relevant decision makers knew nothing of the plaintiff's complaints when they ordered his discharge.

The defendants deny that the plaintiff was discharged because of his complaints about Khedouri.  According to the defendants, the plaintiff's discharge concluded a series of progressive disciplinary measures dating back to July 2002, which were unrelated to the plaintiff's alleged complaints.

In November 2001, the plaintiff purchased a 2000 Ford Crown Victoria, Model P71 "Police Interceptor" and installed additional emergency equipment in the vehicle.  (Defs.' Stmt. ¶¶ 11-12; Pl.'s Stmt. ¶¶ 11-12.)  He used the lights and sirens he installed in the car to pass other motorists on his way to work, travel quickly to a "computer emergency," and pull over

---

[6] These allegations are based on the plaintiff's own assertions, which the defendants accepted for purposes of this motion.  VanderNaalt denied that the plaintiff ever told him that the plaintiff intended to complain to the COIB. (Vander. Depo. at 187-88.)

motorists who he believed to be driving erratically.  (Defs.'
Stmt. ¶ 14; Pl.'s Stmt. ¶ 14.)

The plaintiff was not a police officer, peace officer, or
emergency medical technician.  (Defs.' Stmt. ¶ 8; Pl.'s Stmt. ¶
8.)  The plaintiff also owned several handguns, which he was
licensed to carry, and a pair of handcuffs, which he may have
carried on his person while working at DOI.  (Defs.' Stmt. ¶ 9;
Pl.'s Stmt. ¶ 9.)

On July 11, 2002, two Assistant Commissioners of DOI met
with the plaintiff to discuss his vehicle and his manner of
dress, which the defendants contend suggested that the plaintiff
was conveying the impression that he was acting as a law
enforcement officer.  (See Defs.' Stmt. ¶¶ 10, 15-16; Pl.'s
Stmt. ¶¶ 10, 15-16; Ben. Depo. I at 158.)  The plaintiff
disputes that he was told to remove the emergency equipment from
his vehicle.  (Pl.'s Stmt. ¶ 16.)  The plaintiff claims that he
was told that he could keep his emergency lights, as long as he
moved them from his dashboard to the floor of his car.  (Id.)
The plaintiff does not however dispute that he was told to tone
down his appearance at the meeting.  (Id.)  After the meeting,
the plaintiff showed one of the Assistant Commissioners that he
had met with, Vincent Green, that the police package on his
vehicle had been disconnected and was inoperable.  (Defs.' Stmt.
¶ 18; Pl.'s Stmt. ¶ 18.)

The defendants allege that on October 1, 2002, the plaintiff flashed his emergency lights at a DOI employee. (Defs.' Stmt. ¶ 20.)  The plaintiff does not recall this incident.  (Pl.'s Stmt. ¶ 20.)  However, it is undisputed that on October 4, 2002, the plaintiff had another meeting with supervisors where he was given a written warning directing him to remove the emergency equipment from his vehicle.  (Defs.' Stmt. ¶ 21; Pl.'s Stmt. ¶ 21.)  The warning contained in the memorandum advised the plaintiff that failure to comply with the directive could result in sanctions, including disciplinary action or loss of employment.  (Defs.' Stmt. ¶ 22; Pl.'s Stmt. ¶ 22.)

On October 8, 2002, DOI General Counsel Marjorie Landa and Inspector General Robert Joyce interviewed the plaintiff. (Defs.' Stmt. ¶ 23; Pl.'s Stmt. ¶ 23.)  At the interview, the plaintiff admitted to using the lights and sirens in his car to pull over drivers.  (Defs.' Stmt. ¶ 24; Pl.'s Stmt. ¶ 24.)  The plaintiff also admitted to one altercation with a New York Police Department ("NYPD") Traffic Officer over the plaintiff's impermissible use of his parking permit.  (Id.)

From October to November 2002, there were continuing discussions at executive staff meetings about whether the plaintiff should be terminated because he had exhibited poor judgment in seeking to convey that he was a member of law

11

enforcement despite the fact that he was a civilian computer technician.  (Defs.' Stmt. ¶ 27; Pl.'s Stmt. ¶ 27.)  Ultimately, on November 15, 2002, Commissioner Hearn opted to reprimand the plaintiff formally and dock him three days' annual leave. (Defs.' Stmt. ¶ 28; Pl.'s Stmt. ¶ 28; Ex. M. to Glazer Decl.) After that, the plaintiff received a performance evaluation, which the plaintiff signed on November 18, 2002, that stated that "[d]uring the past year, Ron had some performance issues that he adequately addressed and resolved."  (Defs.' Stmt. ¶ 29; Pl.'s Stmt. ¶ 29; Ex. D to Ben. Aff.)  The plaintiff was given a rating of three on a scale of one to five, which corresponds to "fully meets requirements."  (Ex. D to Ben. Aff.)

Then in early December, the plaintiff was involved in another incident when he tried to turn in a defaced handgun to the police on behalf of a member of his synagogue.  (Defs.' Stmt. ¶¶ 31, 33; Pl.'s Stmt. ¶¶ 31, 33.)  Some of the events surrounding this incident are in dispute.  However, it is undisputed that Robert Joyce, one of the plaintiff's supervisors, was eventually contacted during the incident. (Defs.' Stmt. ¶ 36; Pl.'s Stmt. ¶ 36.)  Joyce produced a memorandum about the incident, where he noted that the police sergeant who contacted him told him that "Benvenisti refused to give answers and had a bad attitude."  (Ex. Q to Glazer Decl.)

After that incident, Hearn and Glazer instructed the law department to review whether there was a sufficient basis to terminate the plaintiff for cause, and if so, to confirm the necessary follow up steps to doing so.  (Defs.' Stmt. ¶ 38; Pl.'s Stmt. ¶ 38.)  The plaintiff hired a lawyer after the handgun incident.  (Defs.' Stmt. ¶ 37; Pl.'s Stmt. ¶ 37.)  The plaintiff expressed fears that he might be fired, and the lawyer informed the plaintiff that his fears were well founded.[7]  (Id.)

On December 13, 2002, several of the plaintiff's supervisors received a complaint that the plaintiff had harassed several employees at another City agency and threatened to arrest one of them.  (Defs.' Stmt. ¶ 39.)  The plaintiff denies that he harassed or threatened anybody, but he does not provide any evidence to rebut the defendants' claim that DOI received these complaints.  (Pl.'s Stmt. ¶ 39.)  On Monday, December 16, 2002, a supervisor received another complaint that the plaintiff had threatened to arrest a member of the public.  (Defs.' Stmt.

---

[7] The plaintiff does not dispute this last fact, but objects to its use on the grounds that it is protected by the attorney-client privilege.  (See Pl.'s Stmt. ¶ 37.)  However, the plaintiff revealed that he hired a lawyer because he "knew that something was going to happen at work as a result of this," and that his lawyer suggested that he might lose his job, before any objection. (See Depo. of Ron Benvenisti, June 6, 2005 ("Ben. Depo. II"), attached as Ex. C (Part II) to Decl. of Terri Feinstein Sasanow, Oct. 28, 2005 ("Sasanow Decl."), at 217-18, 220, 236-37.)  This information is therefore not protected by any privilege.  See, e.g., United States v. International Brotherhood of Teamsters, 961 F. Supp. 665, 673 (S.D.N.Y. 1997), aff'd on other grounds, 119 F.3d 210 (2d Cir. 1997); In re Penn Central Commercial Paper Litig., 61 F.R.D. 453, 463 (S.D.N.Y. 1973) ("It is hornbook law that the voluntary disclosure or consent to the disclosure of a communication, otherwise subject to a claim of privilege, effectively waives the privilege.").

¶ 40.)  Again, the plaintiff denies making the threat but offers no evidence that the supervisor did not receive the complaint. (Pl.'s Stmt. ¶ 40.)

Based on all of these events, the defendants allege that at a personnel meeting, held the following morning, on Tuesday, December 17, 2002, DOI Commissioner Hearn declared that the timetable to terminate the plaintiff's employment had been accelerated and that he was to be discharged the following day. (Defs.' Stmt. ¶¶ 43-44; Hearn Decl. at 2-3).  Glazer carried out the order, and the plaintiff was discharged the following day, on December 18, 2002.  (Defs.' Stmt. ¶ 46; Pl.'s Stmt. ¶ 46.)

The defendants maintain that DOI decided to discharge the plaintiff based on his alleged misconduct.  The defendants also maintain that neither Commissioner Hearn, the person who ordered the plaintiff's discharge, nor Glazer, the person who carried it out, had any knowledge of the plaintiff's alleged complaints about Khedouri.

The defendants first point out that based on the timeline of events, the plaintiff's ultimate threat to file a formal complaint with the Conflict of Interest Board or the other external City agencies was not made until after the decision to discharge the plaintiff had already been made.

As noted above, Commissioner Hearn made the decision to discharge the plaintiff and issued the order to that effect at a

personnel meeting on the morning of Tuesday, December 17, 2002. (Defs.' Stmt. ¶¶ 43-44; Pl.'s Stmt. ¶¶ 43-44.)  The plaintiff, however, alleges that he threatened to file the formal complaint to the external agencies on the afternoon of December 17, 2002. (Defs.' Stmt. ¶ 42; Ben. Depo. I at 25, 27, 37.)  Although the plaintiff states that this fact "misrepresents the sequence of events leading to [his] termination" (Pl.'s Stmt. ¶ 42), he offers no facts to show that his threatened complaint occurred at some time other than that afternoon.  As such, the defendants allege that Hearn could not have known about the plaintiff's threat to complain to the COIB or the other City agencies because the plaintiff had not even made the threat at the time Hearn made the decision to discharge the plaintiff at the morning personnel meeting.

Second, both Glazer and Hearn have produced sworn statements that they had no knowledge of any complaints that the plaintiff made about Khedouri until after the order to terminate his employment had already been given.  (See Defs.' Stmt. ¶¶ 43-46; Glazer Decl. at 13-14; Decl. of Rose Gill Hearn, Oct. 28, 2005 ("Hearn Decl."), at 3.)  Indeed, VanderNaalt, Joyce, and Green, each of the supervisors that the plaintiff allegedly complained to, denied that they ever forwarded any information about any complaints the plaintiff might have made about Khedouri.  (See Vander. Depo. at 184-89; Depo. of Robert Joyce,

June 24, 2005, attached as Ex. E to Sasanow Decl. ("Joyce Depo."), at 124-25; Depo. of Vincent Green, June 22, 2005, attached as Ex. F to Sasanow Decl. ("Green Depo."), at 138-39, 160.)

The plaintiff disputes this claim, asserting that VanderNaalt informed him that his complaints were properly reported up the chain of command and that in a paramilitary organization such as DOI, Hearn's and Glazer's knowledge can be inferred.  (Pl.'s Stmt. ¶ 45.)  However, the plaintiff concedes that VanderNaalt told him that he passed the plaintiff's concerns to Joyce and Green, not to Hearn or Glazer, and the plaintiff candidly admitted that he had no personal knowledge of whether Hearn or Glazer were informed of his concerns.  (Ben. Depo. I at 49-50.)  The plaintiff offers no evidence to rebut the defendants' evidence that Hearn and Glazer lacked knowledge of the plaintiff's complaints.


### III.

The plaintiff claims that he was discharged in retaliation for his complaints about Khedouri and his threat to report the alleged conflict of interest involving Khedouri to external agencies in violation of the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

It is well-established that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick v. Myers, 461 U.S. 138, 142 (1983).  In defining the protection afforded public employee speech, the Supreme Court has been sensitive to the "public's interest in receiving the well-informed views of government employees engaging in civic discussion." Garcetti v. Ceballos, 126 S. Ct. 1951, 1958 (2006) Yet "while the First Amendment invests public employees with certain rights, it does not empower them to 'constitutionalize the employee grievance.'" Garcetti, 126 S. Ct. at 1959 (quoting Connick, 461 U.S. at 154). "Government employers, like private employers, need a significant degree of control over their employees' words and actions" in order to provide services to the public efficiently.  Id. at 1958.

Therefore, in order for a public employee to state a claim for First Amendment retaliation, the plaintiff initially must show by a preponderance of the evidence that:  (1) the plaintiff spoke "as a citizen upon matters of public concern," Connick, 461 U.S. at 147, rather then as an employee on matters of personal interest, (2) the plaintiff suffered an adverse employment action, and (3) the speech at issue was a substantial or motivating factor in the adverse employment action.  See

Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003); Sheppard v. Beerman, 317 F.3d 351, 355 (2d Cir. 2003).

If the public employee successfully states a prima facie case of First Amendment retaliation, the government employer may still prevail by showing by a preponderance of the evidence that it would have taken the same action regardless of the employee's speech.  See, e.g., Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Pappas v. Giuliani, 118 F.Supp.2d 433, 443 (S.D.N.Y. 2000), aff'd, 290 F.3d 143 (2d Cir. 2002).[8]

The defendants argue that the plaintiff has failed to establish a prima facie case of First Amendment retaliation. The defendants further argue under Mt. Healthy that DOI would have discharged the plaintiff regardless of his complaints, given the acts of alleged misconduct in which he engaged.  For these reasons, the defendants claim they are entitled to summary judgment on the plaintiff's First Amendment retaliation claim.

---

[8] In the alternative, the government may prevail by showing:  (1) the adverse employment action is based on a reasonable prediction that the speech will be disruptive, (2) the disruptive potential of the speech outweighs the value of the speech, and (3) the employer's action is based on the disruptive potential of the speech and not taken in retaliation for the speech. Johnson, 342 F.3d at 114 (citing Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir. 1995)).  This option embodies the balancing test established by the Supreme Court in Pickering v. Bd. of Educ., 391 U.S. 563 (1968).  Here the defendants acknowledge that the plaintiff's speech was not disruptive, and thus concede that Pickering does not apply.

## A.

The threshold question is whether the plaintiff was "speaking as a citizen upon matters of public concern." Connick, 461 U.S. at 147.  In Garcetti, the Supreme Court clarified that this question involves two distinct inquiries. First, the Court must determine whether the plaintiff was speaking as a "citizen" for First Amendment purposes.  See Garcetti, 126 S. Ct. at 1957; Freitag v. Ayers, ---F.3d---, 2006 WL 2614120, at *11 (9th Cir. Sept. 13, 2006).  After that, the Court must turn to the traditional Connick analysis and ask whether, viewing the record as a whole and based on the content, context, and form of a given statement, the plaintiff's speech was made as a citizen upon "matters of public concern."  461 U.S. at 147-48.  "The inquiry into the protected status of speech is one of law, not fact."  Id. at 148 n.7.

## 1.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes..." Garcetti, 126 S. Ct. at 1960.  In Garcetti, Ceballos, a deputy district attorney in Los Angeles who served as a calendar deputy, alleged First Amendment retaliation after he drafted and circulated a disposition memorandum recommending the dismissal of a criminal case based on his investigation of, what he perceived to be, serious

misrepresentations made by the warrant affiant in the case.  Id. at 1955-56.  The Supreme Court stated that the "controlling" factor in determining that the plaintiff was not entitled to First Amendment protection was that the plaintiff's expressions were made "pursuant to his duties as a calendar deputy."  Id. at 1959-60.  As the Supreme Court explained:

> Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings.  In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a criminal case.  When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee.

Id. at 1960.  In sum, "Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do."  Id.  Following Garcetti, courts in this District have dismissed First Amendment retaliation claims upon finding that a plaintiff's speech was made pursuant to his official duties.  See, e.g., Ruotolo v. City of New York, 03 Civ. 5045, 2006 WL 2033662, at *3-4 (S.D.N.Y. July 19, 2006) (finding that a safety officer's report on environmental risks and conversations concerning the report were made pursuant to his official duties); Brewster v. City of Poughkeepsie, 434 F.Supp.2d 155, 157 (S.D.N.Y. 2006) (finding that a police officer's letters to the Chief and Deputy Chief of Police and the District Attorney disputing his supervisor's decision to

dismiss two traffic summonses were written pursuant to his official duties).

The question then is whether the plaintiff's speech was made pursuant to his "official duties."[9]  In analyzing this issue, the defendants divide the plaintiff's speech into two categories:  (1) the plaintiff's weekly complaints to his supervisors about Khedouri and (2) the plaintiff's threat to file a formal complaint to external agencies regarding the Khedouri matter.  The defendants argue that the first category of speech is barred by Garcetti because the plaintiff's complaints were made pursuant to his official duties as a manager of CISAFE and supervisor of Khedouri.  However, the defendants candidly concede that the second category of speech-the alleged threat to report the matter externally-was not part of the plaintiff's official duties and thus is not barred by Garcetti.  Given the defendants' concession, the Court considers only whether the plaintiff's weekly complaints to his supervisors were made pursuant to his official duties.

Although the Supreme Court in Garcetti declined to articulate a framework for defining the precise contours of a public employee's official duties, the Court noted that the "inquiry is a practical one" and recognized that "[f]ormal job

---

[9] Although the Supreme Court issued its decision in Garcetti after this motion for summary judgment was fully briefed, the parties submitted supplemental briefing addressing the issue and discussed the issue at the oral argument.

descriptions often bear little resemblance to the duties an employee actually is expected to perform." 126 S. Ct. 1961-62. Viewing the evidence as a whole, it is clear that the plaintiff's weekly complaints to his supervisors were made pursuant to his official duties.

First, it is undisputed that the plaintiff was a manager of the CISAFE unit and responsible for supervising Khedouri.[10] The plaintiff concedes these managerial responsibilities but nonetheless argues that his reporting to his supervisors of the specific problems involving Khedouri did not fall within the scope of his "official duties." However, the undisputed evidence in the record belies this assertion.

As a manager, the plaintiff was responsible for supervising employees and ensuring the productive operation of his unit. Such responsibilities were part of what the plaintiff was "employed to do." See Garcetti, 126 S. Ct. at 1960. In addition, the plaintiff was part of an organization and supplying information about his unit's performance to supervisors thus also fell within the plaintiff's official duties. The plaintiff's performance evaluation, signed by the

---

[10] The plaintiff states that he was not Khedouri's "direct supervisor" during the relevant time period because Khedouri was "unmanageable." (See Pl.'s Stmt. ¶ 4.) However, it is undisputed that the plaintiff was responsible for supervising Khedouri, whether he was successful in that endeavor or not. (See id.)

plaintiff on November 18, 2002, included a category for
"[p]resenting, explaining, and marketing the work unit's
activities to higher level supervisors in the agency and/or
persons and groups outside the agency."  (Ex. D to Ben. Aff.)
The opportunity for the plaintiff to pass along such information
to his supervisors was amply provided at "formal status
meetings," the place where the plaintiff aired the majority of
his alleged complaints about Khedouri.  Moreover, the plaintiff
admitted that many of the complaints about Khedouri originated
with his employees.  (See, e.g, Ben. Depo. I at 7-11.)  Thus,
for at least some of the complaints about Khedouri, the
plaintiff was merely acting as a conduit through which
information was passed from those he supervised to his
supervisors pursuant to his official duties.

Given that keeping his supervisors apprised of his unit's
status was one of the tasks he was paid to perform as a manager
of CISAFE, the only question is whether the specific complaints
at issue were of the type that the plaintiff would be expected
to discuss with his supervisors.  According to the plaintiff's
characterization of his deposition testimony, the plaintiff
complained to his supervisors that:  (1) the appearance that
Khedouri received specialized treatment had a negative effect on
office morale and the ability of the department to function; (2)
Khedouri's salary was exorbitant and precluded DOI from hiring

23

additional employees; and (3) Khedouri's performance hindered CISAFE's ability to operate effectively and provide services to the public.  (Pl.'s Stmt. ¶ 26; Pl.'s Mem. of Law in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") at 9.)  These complaints all focused on the impact of Khedouri's employment on CISAFE, its effect on office morale and the unit's financial resources, performance, and operation.  As the plaintiff himself stated at his deposition about his purpose for making these complaints, Khedouri's performance involved a "productivity issue" (Ben. Depo. I at 34), he "just wanted [Khedouri] to take things a little more seriously" (Ben. Depo. II at 154), and he was "[j]ust moving it up the chain of command" (Ben. Depo. I at 36). In sum, the plaintiff's complaints to his supervisors involved precisely the sorts of internal office affairs and employment matters that the plaintiff—as a manager and supervisor—had a duty to address.[11]  For these reasons, the plaintiff's weekly complaints about Khedouri to his supervisors were made pursuant to his "official duties" and thus were not made in his capacity as a citizen for First Amendment purposes.

---

[11] Even assuming that these complaints embedded a discussion about a conflict of interest, and that discussion of the conflict of interest touched on matters of public concern, the speech would still be within the scope of the plaintiff's official duties.  Garcetti teaches that an employee speaking pursuant to his official duties does not speak as a citizen for First Amendment purposes, even when his speech touches on matters of public concern.

**2.**

As stated above, the defendants concede that the
plaintiff's threat to file a formal complaint to the external
agencies was not made pursuant to his "official duties" for
Garcetti purposes.  The next issue then is whether the
plaintiff's threat to file a formal complaint with the external
agencies was made "as a citizen upon matters of public concern"
or rather merely "as an employee upon matters only of personal
interest."  Connick, 461 U.S. at 147.

An issue is one of "public concern" that can be "fairly
considered as relating to any matter of political, social, or
other concern to the community."  Id. at 146.  Allegations of
public corruption or wrongdoing are almost always matters of
public concern.  See Johnson, 342 F.3d at 113.  A wide range of
other issues have been found to constitute matters of public
concern.  See, e.g., Givhan v. W. Line Consol. Sch. Dist., 439
U.S. 410 (1979) (allegations of racial discrimination); Lewis v.
Cowen, 165 F.3d 154,164 (2d Cir. 1999) (mismanagement of public
funds); Blum v. Schlegel, 18 F.3d 1005, 1012 (2d Cir. 1994)
(criticism of the federal government's national drug control
policy); Collins v. Christopher, 48 F. Supp. 2d 397, 408
(S.D.N.Y. 1999) (collecting cases).  However, "'speech on a
purely private matter, such as an employee's dissatisfaction
with the conditions of his employment' falls outside the realm

of constitutional protection." Schlesinger v. New York City Transit Auth., 00 Civ. 4759, 2001 WL 62868, at *5 (S.D.N.Y. Jan. 24, 2001) (quoting Lewis, 165 F.3d at 164); see also Cahill v. O'Donnell, 75 F. Supp. 2d 264, 272 (S.D.N.Y. 1999) ("A public employee's speech on matters of purely personal interest or internal office affairs does not constitute a matter of public concern...").

Although certain issues may clearly touch upon matters of public concern in the abstract, the question in each case is whether the particular speech at issue may be "fairly considered" as relating to such issues. See Connick, 461 U.S. at 146. This determination is rarely a simple task "[b]ecause of the enormous variety of fact situations" in which these cases arise. Id. at 154. The Supreme Court has cautioned that "[t]o presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." Id. at 149. "Connick made clear that courts must look behind pretextual 'public concern' rationales proffered by plaintiffs and attempt to discern whether their conduct, taken as a whole, was actually meant to address matters of public concern or was simply a vehicle for furthering private interests." Pappas, 118 F. Supp. 2d at 444 (citing Connick, 461 U.S. at 146–48).

Given these considerations, determining whether speech involved matters of public concern requires a practical inquiry into the "content, form, and context of a given statement, as revealed by the whole record."[12]  Connick, 461 U.S. at 147-48. The issue of "whether an employee's speech addresses a matter of public concern" is a matter of law for the court to decide.  Id. at 148 n.7, 150 n.10.

The plaintiff's threat to file a formal complaint to the external agencies did not touch upon matters of public concern. The plaintiff alleges that he threatened to take all of his prior complaints about Khedouri to the external agencies and, to the extent not already covered, an allegation that Glazer was supposed to recuse herself but that Khedouri was doing projects for her.  (See Pl.'s Stmt. ¶ 42; Ben. Depo. I. at 25-26.)

Most of the plaintiff's alleged complaints provide classic examples of an attempt by a plaintiff to convert what are essentially private employment matters into matters of public concern because the matters happened to have transpired within a

---

[12] According to Garcetti, a public employee can speak on a matter of public concern, yet not speak in the employee's capacity as a citizen.  Garcetti thus distinguished between the capacity in which a person speaks and the subject matter of that speech.  However, under the traditional Connick inquiry, the capacity in which a person speaks has always been a relevant contextual factor in determining whether certain speech touched upon matters of public concern.  See, e.g., Blum, 18 F.3d at 1012 ("The determinative question is whether that interest [in matters of public concern] arises from the speaker's status as a public citizen or from the speaker's status as a public employee.").  Nothing in Garcetti suggests that courts should ignore the capacity in which a person speaks in situations where, for example, an employee's speech may be close to—but not squarely within—his or her official duties.

government office.  See Connick, 461 U.S. at 149.  The record as

a whole reveals that the plaintiff's complaints about office

morale, Khedouri's salary, and the impact of Khedouri's

employment on the effective operation of the unit all involved

internal office affairs, which the plaintiff was concerned about

as a manager.  The plaintiff admitted as much in his deposition

when he stated that his motivation for complaining about

Khedouri was to get "Ely to take things a little more seriously"

(Ben. Depo. II at 154) and stated that Khedouri's performance

was a "productivity issue" (Ben. Depo. I at 39).  The portion of

the plaintiff's deposition testimony that discusses his plans to

file the formal complaint reveals that the plaintiff was not

interested in contributing to the "debate on public issues."

See Laforgia v. Davis, 01 Civ. 7599, 2004 WL 2884524, at *5

(S.D.N.Y. Dec. 14, 2004).  Rather, the plaintiff had received no

satisfaction within DOI and sought to remedy the "morale" and

"management" issues that were plaguing CISAFE.[13]  (See Ben. Depo.

---

[13] The Second Circuit Court of Appeals recently stated that "motive is not
dispositive as to whether an employee's speech is a matter of public
concern," while qualifying that "this is especially true where the motive is
not to address an employment grievance."  Reuland v. Hynes, ---F.3d---, 2006
WL 2391163, at *5-6 (2d Cir. Aug. 21, 2006).  Public concern analysis in this
Circuit is "content-based and not... solely motivation based."  Cioffi v.
Averill Park Central Sch. Dist. Bd. of Educ., 444 F.3d 158, 166 (2d Cir.
2006) (emphasis added).  However, while not dispositive, it remains a factor
for courts to consider in analyzing the overall context in which a statement
is made.  See id.; see also Saulpaugh v. Monroe Community Hosp., 4 F.3d 134,
143 (2d Cir. 1993) (employee's complaints about sexual harassment not a
matter of public concern where there was "no indication that the plaintiff
wanted to debate issues of sex discrimination," that she sought relief
against "pervasive or systemic misconduct," or that she sought to "correct
allegedly unlawful practices or bring them to public attention") (internal
citations and quotation marks omitted); Ezekwo v. NYC Health & Hosp. Corp.,

I at 25-26.)  The plaintiff cannot now convert what were
essentially internal office affairs into matters of public
concern through a revisionist interpretation of his complaints
that draws on the incidental connection between events that
transpire within a government office and public issues.[14]  Cf.
Harris v. Beedle, 845 F. Supp. 1030, 1034 (S.D.N.Y. 1994)
("Plaintiff attempts to tie her criticism of the program into a
general critique of Authority mismanagement and waste.  However,
such abstract concern about a particular subject carries no
weight if the employee chooses not to articulate it.") (internal
citation and quotation marks omitted), aff'd, 35 F.3d 553 (2d
Cir. 1994).

        The plaintiff's threat to report an alleged conflict of
interest within DOI presents a closer question.  Viewed in the
abstract, the plaintiff's report of an alleged conflict of
interest could, at least minimally, implicate government
corruption, mismanagement, or the violation of the City's by-

---

940 F.2d 775, 781 (2d Cir. 1991) (finding that complaints were "personal in
nature," where the plaintiff "was not on a mission to protect the public
welfare" and "her primary aim was to protect her own reputation and
individual development").  The Court accepts the plaintiff's own description
of the motivations for his threat in deciding this motion for summary
judgment.  The defendants suggest that the plaintiff's alleged complaints
about Khedouri were in fact motivated by his desire to create complaints and
thereby deter any sanctions against him and to counter the progressive
discipline that was being imposed upon him for his various actions.  However,
the Court could not accept that disputed motivation on a motion for summary
judgment.  See New York State Law Officers Union v. Andreucci, 433 F.3d 320,
330-31 (2d Cir. 2006).

[14] For these reasons, the plaintiff's earlier complaints, which are barred by
Garcetti, also failed to address matters of public concern.

laws, which could fairly be considered as touching upon matters of public concern.  Cf. Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 553 n.4 ("Plaintiffs' claims related to the administration of the Cooperative and the allocation of funds were based on alleged mismanagement of government funds and violations of its by-laws, which are clearly matters of public concern.")  However when placed in context, even the plaintiff's threat to complain about the alleged conflict of interest cannot be said to touch upon matters of public concern.

First, the plaintiff's threat to file the formal complaint occurred in the course of a conversation with his supervisor.  A private conversation with an employer does not preclude a finding that a public employee was speaking on a matter of public concern.  See Givhan, 439 U.S. at 414.  Nonetheless, the forum that a plaintiff chooses is one factor in determining whether the speech implicated a matter of public concern.  See Dudzik v. City of New York, 01 Civ. 2450, 2003 WL 203226, at *7 (S.D.N.Y. Jan. 29, 2003); Pappas, 118 F. Supp. 2d at 445 (citing Connick, 461 U.S. at 148)  In this case, although the plaintiff threatened to complain publicly, the plaintiff first discussed his decision to do so with his supervisor and then delayed filing the complaint at his supervisor's request.  This fact detracts from the threatened complaint's public character.

Second, the plaintiff's deposition testimony establishes that the alleged complaint regarding the conflict of interest was a minimal part of a broader issue involving internal management.  The thrust of the plaintiff's threatened complaint, as testified to by the plaintiff (Ben. Depo. I at 25-26), was not that the alleged conflict of interest was an independent problem that needed to be brought to the public's attention. Rather, the plaintiff was concerned about the impact of the alleged conflict on his unit's performance—the ability to manage Khedouri and his team's morale.  While speech alleging a conflict of interest might implicate a matter of public concern, where the speech is buried in a context that overwhelmingly suggests that the plaintiff was merely speaking as an employee on matters of internal office affairs, such speech is not entitled to First Amendment protection.  See, e.g., Ezekwo, 940 F.2d at 781 ("[T]he mere fact that one or two of Ezekwo's comments could be construed broadly to implicate matters of public concern does not alter the general nature of her statements."); Hellstrom v. United States Dep't of Veterans Affairs, 178 F. Supp. 2d 164, 169 (N.D.N.Y. 2001) (finding that while affirmative action involves a matter of public concern in the abstract, where comments about affirmative action were given as a personal response to alleged discrimination, those comments

did not implicate a matter of public concern), aff'd, 46 Fed.
Appx. 651 (2d Cir. 2002).

For these reasons, the plaintiff's threat to file a
complaint with the external agencies did not involve a matter of
public concern.  Therefore, the plaintiff has failed to
establish the first element of his prima facie case.

**B.**

The plaintiff has similarly failed to establish the third
element of his prima facie case.  The plaintiff has failed to
produce sufficient evidence that his complaints were "at least a
substantial or motivating factor in the discharge."  Sheppard,
317 F.3d at 355 (internal citation and quotation marks omitted).

A plaintiff can establish proof of causation either
directly or indirectly.  See Gordon v. New York City Bd. of
Educ., 232 F.3d 111, 117 (2d Cir. 2000).  Causation may be
proved indirectly "by showing that the protected activity was
followed closely by discriminatory treatment, or through other
circumstantial evidence."  Id.  In this case, even assuming that
the plaintiff's complaints constituted protected speech, the
plaintiff has failed to establish any evidence, either directly
or indirectly, that DOI discharged him in retaliation for any
protected speech.

First, the plaintiff has offered no direct evidence that
his complaints were a substantial or motivating factor in the

32

decision to terminate his employment.  Rather, the undisputed evidence clearly establishes the contrary, that the plaintiff's complaints were not the reason for his discharge.

As discussed above, the undisputed facts establish that Commissioner Hearn ordered the plaintiff's discharge at a personnel meeting on the morning of Tuesday, December 17, 2002. This decision marked the culmination of a series of progressive disciplinary measures that had been imposed on the plaintiff based on numerous incidents of alleged misconduct and that dated back as early as July 2002.

These disciplinary measures, detailed above, included a formal reprimand on November 15, 2002, which docked the plaintiff three days annual leave.  (Ex. M to Glazer Decl.) Three days later, on November 18, 2002, the plaintiff signed a performance evaluation stating that while the plaintiff had "some performance issues," those issues had been "adequately addressed and resolved." (Ex. D to Ben Aff.)  However, about two weeks later, the plaintiff was involved in the incident with the defaced handgun.  The plaintiff stated that he "knew something was going to happen at work as a result of [the incident]." (Ben. Depo. II at 217.)  The plaintiff hired a lawyer who confirmed his concerns.  (See id. at 217-18, 220, 237.)  Based on these events, Commissioner Hearn and Glazer discussed whether there were any impediments to dismissing the plaintiff, and

instructed their law department that, if not, they should take
the steps necessary to do so.  (Glazer Decl. at 12.)

Then on Friday, December 13, 2002, DOI received complaints
that the plaintiff had harassed employees in another agency and
even threatened to arrest one of them.  The following business
day, Monday, December 16, 2002, DOI received another complaint
that the plaintiff had threatened to arrest a member of the
public.

Based on all of these events, Commissioner Hearn announced
at the December 17 personnel meeting that the timetable to
terminate the plaintiff's employment had been accelerated and
that the plaintiff was to be discharged the following day.
(Glazer Decl. at 13.)

Hearn's decision to discharge the plaintiff was therefore
made on the morning of December 17, 2002.  However, the
plaintiff's alleged threat to file a formal complaint to the
external agencies was not made until the afternoon of that same
day.  (See Ben. Depo. I at 25, 27, 37.)  Although the plaintiff
was not discharged until the following day, the undisputed
evidence shows that the decision to terminate the plaintiff's
employment was made before the plaintiff ever threatened to
complain to the COIB or other external agencies.  Therefore, the
plaintiff's afternoon threat to report the Khedouri matter

externally could not have formed any part of Hearn's decision to
discharge the plaintiff.

Indeed, the plaintiff has failed to produce any evidence
that either Hearn, the decision maker, or Glazer, the person who
carried out Hearn's order to terminate the plaintiff's
employment, had knowledge of any of the plaintiff's complaints.
As detailed above, the defendants have produced affirmative
evidence that at the time the order to terminate the plaintiff's
employment was given, none of the relevant decision makers had
any knowledge whatsoever of the plaintiff's alleged complaints
about Khedouri.  Both Glazer and Hearn have produced sworn
statements that they knew nothing of the plaintiff's alleged
complaints about Khedouri, and VanderNaalt, Green, and Joyce all
denied having passed on such information.

The plaintiff attempts to counter this evidence by stating
that VanderNaalt told the plaintiff that "his concerns were
properly reported up the chain of command" and the plaintiff
alleges that "Glazer was in Plaintiff's chain of command."
(Pl.'s Mem. at 19.)  The plaintiff concludes that "in a
paramilitary organization such as the DOI, Glazer must have
known about Plaintiff's protected speech."  (Id.)

However, this factual assertion is not supported by the
deposition testimony on which the plaintiff relies.  (See Ben.
Depo. I at 49-50.)  That deposition testimony establishes only

that the plaintiff's direct supervisor, VanderNaalt, told the plaintiff that he had reported the plaintiff's complaints to Robert Joyce and Vincent Green.  (Id.)  As explained above, both Joyce and Green denied passing on such complaints.  The plaintiff cannot point to any evidence that his complaints were reported by Joyce or Green to anyone else.  In fact, the deposition testimony reveals that it was VanderNaalt who told the plaintiff "to report this kind of up the ladder."  (Ben. Depo. I at 23.)  The plaintiff points to no evidence that VanderNaalt ever told the plaintiff that VanderNaalt would report the plaintiff's complaints up the chain of command.  The plaintiff is thus left with the bare factual assertion that Glazer "must have known."  The plaintiff cannot at this stage rely on such "conclusory allegations or unsubstantiated speculation."  Scotto, 143 F.3d at 114.  Therefore, the plaintiff has failed to offer any evidence from which an inference can be drawn that either Hearn or Glazer knew about any of the plaintiff's alleged complaints.

The plaintiff also attempts to prove causation indirectly. The plaintiff argues that he is entitled to an inference of causation because the temporal proximity between the time he made his complaints and the time he was fired establishes an inference of retaliatory animus.  In appropriate cases, where an adverse employment action occurs shortly after the protected

speech, an inference that the speech was a motivating factor in the adverse action may be drawn.  See, e.g., Cifra v. General Electric Co., 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."); Gorman-Bakos, 252 F.3d at 554.

However, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in protected activity, an inference of retaliation does not arise." Slattery v. Swiss Reinsurance American Corp., 248 F.3d 87, 95 (2d Cir. 2001); Ayiloge v. City of New York, 00 Civ. 5051, 2002 WL 1424589, at *12-13 (S.D.N.Y. June 28, 2002).

An inference of causation based on temporal proximity is not warranted in this case.  Given that the plaintiff has produced no direct evidence of causation, he is left only with timing as the basis for his claim of retaliation.  The progressive discipline against the plaintiff began in July 2002, well before the plaintiff's complaints about Khedouri began in October 2002.  While the plaintiff disputes some of the details of the meeting he had with the Assistant Commissioners in July 2002, it is undisputed that the defendants counseled the

plaintiff to tone down his appearance and spoke with the plaintiff about modifying the emergency lights on his vehicle.[15]

In any event, the only complaint that the plaintiff made that even arguably can be considered protected speech and which is not otherwise barred by Garcetti was contained in the threat he made to report the Khedouri matter to external agencies.  The plaintiff did not make this threatened complaint until December 17, 2002, well after a well-documented series of progressive disciplinary measures.  Therefore, the plaintiff here is not entitled to an inference of causation based on temporal proximity.

For these reasons, the plaintiff has failed to establish causation, the third element of his prima facie case.

Given that the Court finds that the plaintiff has failed to establish his prima facie case, it is unnecessary to address the defendants' remaining contention that, even assuming that Hearn or Glazer knew about the plaintiff's complaints, DOI would have discharged the plaintiff regardless of the complaints because of his past alleged misconduct.

Because the plaintiff has failed to show that any genuine issue of fact exists as to whether the defendant Glazer violated

---

[15] The defendants claim that the plaintiff was told to remove the emergency equipment completely.  The plaintiff claims that he was told that he could keep the equipment as long as he removed the lights from the dashboard.  Even accepting the plaintiff's version, this marked the beginning of a progressively increasing set of warnings and actions against the plaintiff.

the plaintiff's First Amendment rights, the defendants' motion
for summary judgment on the plaintiff's Section 1983 claim
against Glazer is **granted.**

In addition, given that the plaintiff has not established
an underlying constitutional violation, the defendants' motion
for summary judgment on the plaintiff's Section 1983 claim
against the City of New York is also **granted.**  See, e.g., Segal
v. City of New York, ---F.3d---, 2006 WL 2171456, at *10-11 (2d
Cir. Aug. 3, 2006); Rivera v. City of New York, 392 F. Supp. 2d
644, 656 (S.D.N.Y. 2005).

## V.

The defendants argue that the plaintiff's state law claim
under the Whistleblower Law must be dismissed because the
statute provides no private cause of action.  However, because
the plaintiff's Section 1983 action is dismissed and there are
no remaining federal claims, the Court declines to exercise
supplemental jurisdiction over this purely state law claim.  See
28 U.S.C. § 1367(c)(3); Valencia ex rel. Franco v. Lee, 316 F.3d
299, 304-06 (2d Cir. 2003).  Therefore, the plaintiff's state
law claims against the defendants under the Whistleblower Law
are **dismissed without prejudice.**

39

## CONCLUSION

The Court has considered all of the arguments raised by the parties.  To the extent not specifically addressed herein, the arguments are either moot or without merit.  The motion for summary judgment is **granted**.  The Clerk is directed to enter judgment and to close this case.


**SO ORDERED.**

**Dated:  New York, New York**
        **September 23, 2006**

          John G. Koeltl
    United States District Judge

40